NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0597n.06

No. 09-1294

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

*Aug 23, 2011*

LEONARD GREEN, Clerk

MELVIN ANDERSON,

    Petitioner-Appellant,

        v.

JAN TROMBLEY, Warden, Saginaw Correctional
Facility,

    Respondent-Appellee.

On Appeal from the United
States District Court for the
Eastern District of Michigan
at Detroit

---

**Before:** **BATCHELDER, Chief Circuit Judge; GUY and MOORE, Circuit Judges**

    **RALPH B. GUY, JR., Circuit Judge**. Petitioner Melvin Anderson, a Michigan prisoner, appeals from the denial of his pro se petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254, with respect to his conviction following a jury trial of two counts of possession with intent to deliver 50 grams or more but less than 450 grams of cocaine, two counts of possession of a firearm during the commission of a felony (second offense), and one count of felon in possession of a firearm. With the aid of counsel appointed when this court granted a certificate of appealability, petitioner seeks to overturn his convictions on the grounds of ineffective assistance of counsel, insufficiency of the evidence, and prosecutorial misconduct. After review of the record and consideration of the arguments presented on appeal, we affirm.

**I.**

An investigation into drug trafficking led to the issuance of a warrant to search the townhome located at 36 Karen Court #2, in Pontiac, Michigan. At 11:30 a.m., on June 11, 2004, the same day that the warrant was issued, Pontiac Police Officer Daniel Main began pre-raid surveillance of the Karen Court residence. Officer Main had viewed photographs of two suspects: petitioner Melvin Anderson, known by the nickname "Smiley," and a black female identified as Shaniqua Broome.[1] Officer Main had been advised that petitioner was the target of the search, was known to drive a gold Jaguar and a black Expedition, and had prior assault convictions involving firearms.

At about noon, Main observed petitioner come out of the Karen Court residence and drive away in a black Expedition. Main advised the raid-team that was en route, and continued his surveillance. From about 12:45 p.m. until petitioner returned at 1:00 p.m., Officer Main observed Broome looking out from the residence. When petitioner returned to the Karen Court residence and parked outside, Broome came out and got into the front passenger seat of the Expedition. Uniformed officers in a marked patrol car moved in and detained the occupants of the Expedition, and the search team entered the residence to execute the search warrant.

Officer Andre Siner testified that he and his partner blocked in the Expedition, approached on foot, and ordered petitioner to show his hands and get out. Petitioner complied and was secured with his hands on the top of the Expedition. As petitioner did so,

---

[1]The codefendant's last name also appears in the record as "Broom," but for consistency we refer to her as "Broome."

Officer Siner observed a clear plastic bag containing an off-white substance that he suspected to be crack cocaine protruding from petitioner's jacket pocket. It was removed, a pat-down followed, and then petitioner was arrested, handcuffed, and placed in a patrol car during the search of the premises. Forensic chemist Rachel Topacio testified that the white substance found in petitioner's pocket weighed 125.44 grams and the analysis showed that it was cocaine. This was the basis of one of petitioner's drug convictions. Petitioner filed a motion to suppress the evidence seized from his person, which the trial court denied following an evidentiary hearing.

The other convictions were based on the seizure of (1) 66 corner-tie baggies containing 170.97 grams of a substance believed to be crack cocaine that was found in a false-bottomed coffee container on a shelf in the kitchen; (2) plastic bags containing 148.32 grams of a white substance believed to be cocaine from a brown canvas tote bag found on a closet shelf in the master bedroom; and (3) a .357 caliber semi-automatic Glock handgun found between the mattress and box springs at the foot of the bed in the master bedroom. Petitioner stipulated that he had a prior conviction that made him ineligible to possess or receive a firearm. The suspected cocaine found in the search of the house was weighed by the forensic chemist, who explained that it was not analyzed because more than 50 grams had already tested positive for cocaine and all of the suspected cocaine together did not weigh more than 450 grams. During trial, however, the prosecutor asked Officer Charles Janczarek, the officer in charge, to conduct a preliminary field test of the suspected cocaine found in the kitchen and bedroom. Both tested positive for cocaine.

The Karen Court residence had two bedrooms, one master bedroom and one bedroom that appeared to belong to a child. Broome, who lived there with her daughter, was also charged and pleaded guilty, but did not testify at trial. The master bedroom had one bed with women's clothes on the floor on one side, and men's clothing on the floor on the other side between the bed and the wall. The closet also had women's clothes on one side and men's clothes on the other. An officer testified that the men's clothing was generally "consistent" with petitioner's size, and that the size of women's clothing was consistent with the pregnant Broome.

The handgun was found under the bottom corner of the mattress on the side of the bed with the men's clothing. Also on that side of the bed was a nightstand on which was found $600 cash, a magazine for the handgun, and correspondence belonging to petitioner. Specifically, there were bank statements in petitioner's name for the previous two months and an envelope from the Pontiac Police Department, each of which was addressed to petitioner at 147 Murphy Street. In and under that nightstand police found: a shoe box containing cocaine residue; a drug-cutting agent called Mannitol; sandwich baggies and scissors; a spiral notebook containing what appeared to be a drug tally sheet; and a detached cover for the notebook that had an impression of the name "Smiley" and petitioner's signature worn into it. On the kitchen counter, within five or six feet of the false-bottomed coffee canister, was a letter from the Friend of the Court addressed to petitioner at 147 Murphy Street. In the hallway, a shopping bag hung on the handle of a closet door that contained sandwich-size plastic bags with the corners torn out.

Petitioner did not testify, but the defense called petitioner's mother Kathryn Carr. Carr testified that Broome lived at 36 Karen Court #2, but that petitioner lived with her and received mail at her home at 147 Murphy Street. Carr added that petitioner had been on parole, explained that officers had visited her home to verify that petitioner was living with her, and acknowledged that petitioner had been released from parole in February 2004. On cross-examination, Carr conceded that petitioner and Broome were not just friends, that they had "socialized and dated," and that petitioner might have sometimes spent the night at Broome's home.

On December 10, 2004, at the conclusion of the one-and-a-half day trial, the jury found petitioner guilty on all counts. Petitioner was sentenced as a habitual offender, third offense, to concurrent prison terms of 12 to 40 years each for possession with intent to deliver cocaine and 2 to 10 years for the felon-in-possession conviction, to be served consecutively to two concurrent 5-year terms of imprisonment on the felony-firearm convictions. The Michigan Court of Appeals affirmed his convictions, and the Michigan Supreme Court denied leave to appeal. *People v. Anderson*, No. 260698, 2006 WL 2787878 (Mich. Ct. App. Sept. 28, 2006), *lv. denied*, 726 N.W.2d 44 (Mich. Jan. 29, 2007).

The pro se petition for writ of habeas corpus filed on May 18, 2007, asserted five claims of error: ineffective assistance of trial counsel, error in the denial of his suppression motion, insufficiency of the evidence, prosecutorial misconduct, and error in allowing a prosecution witness to field test the substances found in the residence. In an opinion and order entered February 29, 2009, the district court denied the petition on the merits and on

the grounds of procedural default. On the same day that the judgment was entered (and after), petitioner filed a series of motions requesting an evidentiary hearing, oral argument, a reopening of the petition, and appointment of counsel. The district court found that none of the arguments warranted a different disposition and denied the motions on May 11, 2009. This court granted petitioner a certificate of appealability and appointed counsel to represent him.

## II.

On appeal from the denial of a petition for writ of habeas corpus, we review the district court's findings of fact for clear error and questions of law de novo. *See Goff v. Bagley*, 601 F.3d 445, 455 (6th Cir. 2010), *cert. denied*, 131 S. Ct. 1045 (2011). Under the Antiterrorism and Effective Death Penalty Act (AEDPA), which governs this case, the writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits unless the state court's adjudication resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2).[2]

## A. Sufficiency of the Evidence

Taking the claims out of order, we begin with petitioner's contention that the evidence

---

[2]Although petitioner argued that it was unclear whether the state court's adjudication of claims in a summary or incomplete fashion would be entitled to this deference, the Supreme Court has since held that deference under § 2254(d) applies to claims adjudicated on the merits even when the state court's decision is unaccompanied by any reasoning. *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

was insufficient to support a finding that he constructively possessed either the cocaine seized from inside the residence or the firearm found in the master bedroom and, therefore, that the evidence was insufficient to support one of his convictions for possession with intent to deliver cocaine or any of the firearm convictions.[3]

In support of this contention, petitioner relies on this court's discussion of the proof required to establish constructive possession on direct appeal from a federal felon-in-possession conviction in *United States v. Grubbs*, 506 F.3d 434, 440 (6th Cir. 2007). There, this court explained that "the less evidence tying a defendant to a gun at the time of arrest, the greater the circumstantial evidence must be to support a conviction." *Id*. (reversing conviction where gun was concealed in bed of the defendant's brother, in a room where the defendant did not sleep, and the only evidence of possession was the report that defendant waived a gun that "looked like" the one seized during a confrontation in the street a month or two earlier). Not only was the circumstantial evidence more attenuated in *Grubbs*, but also we must be mindful of the double layer of deference that is applicable to this claim under AEDPA because the state court resolved this claim on the merits.

"First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a

---

[3]It is clear from the arguments presented that petitioner does not challenge the sufficiency of the evidence to support the conviction for possession with intent to deliver the cocaine found on his person. Nor does petitioner challenge the state court's determination that there was sufficient evidence to conclude that the drugs and weapon were in close enough proximity for the jury to reasonably infer that they were possessed at the same time.

reasonable doubt." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)), *cert. denied*, 130 S. Ct. 1081 (2010). This is done without reweighing the evidence, re-evaluating the credibility of witnesses, or substituting our judgment for that of the jury. *Id.* Even if we might not have voted to convict, "we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution." *Id.*

"Second, even were we to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205. We may not grant the writ unless the state court's decision was "objectively unreasonable," or, in other words, no "fair minded jurists" could resolve the case in the way the state court did. *See Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *Sanborn v. Parker*, 629 F.3d 554, 577 (6th Cir. 2010), *petition for cert. filed*, (U.S. July 15, 2011) (No. 10A1075, 11-5328).

As the Michigan Court of Appeals explained, constructive possession requires proof that the defendant had the right to exercise control over the contraband and knowledge of its presence. *People v. Wolfe*, 489 N.W.2d 748, 753-54 (Mich. 1992). Also, "possession may be joint, with more than one person actually or constructively possessing a controlled substance." *Id.* at 753. A defendant may have constructive possession of a firearm if its location is known and it is reasonably accessible to him. *People v. Burgenmeyer*, 606 N.W.2d 645, 649 (Mich. 2000). Further, possession may be shown by circumstantial

evidence and reasonable inferences that may be drawn from the evidence. *People v. Meshell*, 696 N.W.2d 754, 759 (Mich. Ct. App. 2005). The question is whether, viewing the evidence in the light most favorable to the prosecution, the evidence establishes a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over the substance. *Wolfe*, 489 N.W.2d at 754.

Petitioner argues that no rational trier of fact could find that he constructively possessed the contraband seized from the residence when no fingerprints at all were found on the weapon, only one unidentified fingerprint was found on the false-bottomed coffee can, his driver's license and the correspondence belonging to him bore his mother's address, and the men's clothing found on the floor and in the closet of the master bedroom was described only as being generally consistent with petitioner's size. On the contrary, the circumstantial evidence was sufficient to permit a rational trier of fact to conclude that, although petitioner used his mother's address, he had sufficient connection to the Karen Court residence and the bedroom where cocaine, cocaine packaging paraphernalia, and the semi-automatic handgun were found to support a finding of constructive possession. Petitioner's bank statements from the previous two months were on the night stand and a letter to him from the Friend of the Court was on the kitchen counter. His nickname and signature were etched on the detached cover of the spiral notebook found in the night stand that contained a drug tally sheet. There was testimony that petitioner dated and socialized with Broome, sometimes spending the night at her home, and men's clothing was on the floor by the bed and in the closet under the shelf where the brown tote bag was found. Petitioner was also seen leaving

the premises on the day of the search, and he returned an hour later with more than 120 grams of crack cocaine in his pocket. Moreover, even if we were not convinced that the evidence was sufficient, we cannot conclude that it was objectively unreasonable for the Michigan Court of Appeals to determine that a rational trier of fact could find that constructive possession had been established beyond a reasonable doubt based on the evidence introduced at trial. *Brown*, 567 F.3d at 205.

## B. Ineffective Assistance of Counsel

Petitioner seeks habeas relief on the grounds that retained counsel Henry Milton denied him effective assistance of counsel with respect to the pretrial suppression motion and through his representation of petitioner at trial. Although the focus of this claim has shifted somewhat on appeal, the acts and omissions complained of here were raised and adjudicated on the merits in the state court and were asserted in the pro se habeas petition. Under *Strickland*, petitioner must demonstrate both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668 (1984); *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 (2009). The Supreme Court recently explained that, under AEDPA: "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 131 S. Ct. at 785.[4] The Court outlined the showing required as follows:

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [*Strickland*,] 466 U.S. at 688 []. A court considering a claim

---

[4]Reversing the grant of habeas relief based on ineffective assistance of counsel, the Court observed that the court of appeals "appear[ed] to have treated the unreasonableness question as a test of its confidence in the result it would reach under *de novo* review" and explained that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 131 S. Ct. at 786.

of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id*., at 689 []. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*., at 687 [].

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*., at 694 []. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*., at 693 []. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*., at 687 [].

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, [] 130 S. Ct. 1473, 1485 [] (2010). . . . The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690 [].

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*., at 689 []; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 [] (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, [] 129 S. Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. [*Id*.] Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

131 S. Ct. at 787-88. In this appeal, petitioner argues that Attorney Henry, who took over petitioner's representation after the preliminary examination and before the evidentiary hearing on the motion to suppress, rendered deficient performance because counsel could not hear or follow the proceedings; failed to effectively litigate the suppression issue; and failed to introduce "exculpatory" evidence, elicited unfavorable testimony, and failed to object to

the field testing of the cocaine at trial.  We address these claims in turn.

### 1.        Counsel Could not Hear or Follow All of the Proceedings

Petitioner relies on Attorney Henry's ready admission that he did not hear well, "several dozen" requests for clarification during the evidentiary hearing and trial, and two instances indicating that a misunderstanding had occurred.  The Michigan Court of Appeals rejected the claim that defense counsel's hearing problem affected his performance, stating:

> Although the record establishes that counsel required the use of a hearing aid and sometimes had problems hearing, the record discloses that the trial court had the participants speak louder, repeat statements, or correct defense counsel if he misunderstood something that was said.  There is no indication that counsel's hearing problems affected his performance in a manner that was prejudicial to defendant.

*Anderson*, 2006 WL 2787878, at *8.

On appeal, petitioner argues that defense counsel needed to have information repeated or clarified 27 times during the 1 ½ hour suppression hearing conducted over two days. Petitioner emphasizes that Henry apologized to a witness, stating:  "Oh, I, I really, I'm sorry. I got this hearing aid in here, it doesn't work that well."  This statement came when asking Officer Main why the police had waited to execute the search warrant.  When Officer Main answered, "Mr. Anderson was the target of our search warrant," defense counsel said, "I beg your pardon?" and had Officer Main repeat that petitioner was the target of the search warrant.  At another point, Attorney Henry did not hear Officer Janczarek say that a page was missing from the search warrant he had been asked to look at, but the trial judge interrupted, stating:  "Mr. Henry, you didn't hear him. . . He said there's a page missing."  Later, defense counsel asked Officer Janczarek to repeat himself, but it is clear that it was aimed at

correcting the impression that the controlled purchases from the Karen Court residence had been made directly from the defendant. As a result, the witness clarified that the controlled purchases were made from the residence while petitioner was there. From an independent review of each instance of repetition or clarification at the suppression hearing, we find that none reflect that defense counsel's hearing problems rendered his performance objectively unreasonable or resulted in any prejudice to petitioner.

With respect to the trial, which was conducted over a day and a half, petitioner has identified 42 instances when Attorney Henry needed information to be repeated or clarified. For example, in his opening statement, defense counsel warned the jury that he may "sound loud" because he did not "hear all that well." A number of times Attorney Henry asked to have something repeated because he did not hear it, and the statement was repeated. (*E.g.*, "I beg your pardon?"; "Huh?"; "I'm sorry?"; "I can't hear you."; "What did you say?"). At times, the trial judge, Oakland County Circuit Judge Steven Andrews, instructed that the Information be read "nice and loud," asked the prosecutor to "speak up" during voir dire, told the witness conducting the field testing to speak louder, and asked whether counsel had heard an answer.[5]

Only two instances identified by petitioner suggest that Attorney Henry did not understand or missed something. First, defense counsel asked Officer Janczarek about the absence of fingerprints on the weapon. Then counsel asked if he had said there was a man's

---

[5]Petitioner also points out that Attorney Henry incorrectly referred to Judge Andrews as "Judge Anderson" in closing argument, but this error is not attributed to difficulty hearing, and is not conduct that falls below an objective standard of reasonableness.

footprint on the side of the bed, stating: "I'm talking about the footprint. Maybe I'm – I know I can't hear that well." The witness answered that he never saw a footprint. During direct examination, the prosecutor asked Officer Janczarek about the spiral notebook and the handwritten tally sheet that suggested quantities of a quarter kilo, or 250 grams, per week. Defense counsel objected on several grounds, including that it had been excluded, even though the spiral notebook had actually been admitted into evidence. The objection went as follows:

> Objection to any indirect mention to a book found in, in a place not connected with this defendant. And that writing has already been excluded and now its trying to indirectly sneak in something about what's in the book. He's given his opinion. This man must be a multi-millionaire with $125,000 per week. Your Honor, I object to that use of that book. It has been excluded and, and it, therefore, cannot be indirectly entered in this case against the defendant.
>
> Now, that might be well about whoever wrote that book. But there's no indication that he has anything to do with the writing. As a matter of fact, if you inspect the book, you'll see, your Honor, that that book has a number of handwriting entries in there, different, which are obvious and, therefore, I would object to any questioning from this book as if this, this man is making $125,000 a week.

The trial judge confirmed that the exhibit had been admitted into evidence and overruled the objection. Then the prosecutor had the witness identify the few pages from the notebook that were drug tally sheets. Although these two instances indicate that defense counsel misheard, misunderstood, or just missed something, they do not demonstrate error so serious as to deprive petitioner of effective assistance of counsel.

Moreover, even if we were to conclude that counsel's performance was deficient, it was not objectively unreasonable for the state court to conclude that counsel's hearing

problems did not affect his performance in a manner that was prejudicial to petitioner. Indeed, petitioner does not argue that defense counsel's hearing problems resulted in prejudice under *Strickland*, but asserts for the first time that we should presume prejudice on the grounds that counsel's hearing impairment prevented him from assisting the accused during critical stages of the proceedings. *See United States v. Cronic*, 466 U.S. 648, 659, n.25 (1984).

In *Cronic*, the Court "identified three situations implicating the right to counsel that involved circumstances 'so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'" *Bell v. Cone*, 535 U.S. 685, 695 (2002) (quoting *Cronic*, 466 U.S. at 658-59). We have described the first of these to be "'the complete denial of counsel, in which the accused is denied the presence of counsel at a critical stage.'" *Ivory v. Jackson*, 509 F.3d 284, 294 (6th Cir. 2007) (citation omitted) (holding attorney who allegedly abused alcohol and drugs but was conscious, cross-examined witnesses, and made a coherent closing was not constructively absent from the proceedings).

Although petitioner draws analogy to the lawyer who slept through portions of the trial in *Burdine v. Johnson*, 262 F.3d 336, 341 (5th Cir. 2001) (en banc), an independent review of the transcripts of both the suppression hearing and the trial in this case reveals that counsel's hearing difficulties did not result in a complete denial of counsel such that his performance should be deemed to be prejudicial per se. Further, if nothing else, the state court's implicit rejection of this contention by requiring a showing of prejudice was not contrary to, or an unreasonable application of, Supreme Court precedent. *See Wright v. Van*

*Patten*, 552 U.S. 120, 125-26 (2008) (holding telephonic appearance not necessarily a complete denial of counsel).

### 2.      Suppression Motion

Petitioner acknowledges that Fourth Amendment claims generally may not be litigated in habeas proceedings, and has abandoned his claim with respect to the merits of the suppression motion.[6]   What remains is petitioner's claim that Attorney Henry rendered constitutionally ineffective assistance of counsel in litigating the suppression motion by (1) failing to impeach Officer Siner using testimony from the preliminary examination; (2) failing to correct a factual error in the trial court's order denying the motion to suppress; and (3) failing to present coherent arguments regarding the manipulation of the circumstances of the search by waiting for petitioner to return before executing the warrant.   Petitioner contends that the cocaine found in his pocket would have been suppressed if counsel had competently litigated this issue.

### a.      Impeachment of Officer Siner

At the preliminary examination, Officer Siner testified that in the "take down" of the Expedition, he and his partner ran up to the Expedition, yelled for petitioner to show his hands, removed petitioner from the vehicle by pulling on his arm, and secured petitioner with his hands up on the Expedition.   Petitioner argues that although the transcript from the

---

[6]The habeas petition claimed that evidence was seized from petitioner in violation of the Fourth Amendment.  The district court properly denied the claim since a court cannot reexamine a petitioner's Fourth Amendment claim that evidence should have been suppressed as the fruit of an illegal search or seizure when the state provided an opportunity for full and fair litigation of the Fourth Amendment claim prior to trial.  *See Stone v. Powell*, 428 U.S. 465, 494-95 (1976); *Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000).

preliminary examination was available prior to the suppression hearing, Attorney Henry made no attempt to impeach Officer Siner about the extent of force used to detain petitioner when Siner testified that he "asked the driver to step out and to put his hands on top of the car." Petitioner argues that Siner's "more polite" description of the detention impacted the trial court's determination that the seizure did not constitute an immediate arrest.

The Michigan Court of Appeals upheld the denial of petitioner's suppression motion, finding "no merit" to petitioner's argument that he was initially arrested, not just detained, by the police when he was removed from his vehicle. The state court found that the detention and removal of petitioner from his vehicle was justified under *Michigan v. Summers*, 452 U.S. 692, 705 (1981), and this court's application of *Summers* in *United States v. Cochran*, 939 F.2d 337, 339 (6th Cir. 1991). The state court explained in pertinent part:

> We find no merit to defendant's argument that he was initially arrested, not detained, by the police. In *People v. Zuccarini*, 172 Mich. App. 11, 13-15 [] (1988), this Court found that the defendant was only detained under *Summers*, not arrested, when, for safety reasons, he was handcuffed outside a house that was being searched after the officer handcuffing him thought she heard a lot of people running inside the house. A search for narcotics may give rise to sudden violence, and minimizing the risk of harm to the police and the occupants by exercising unquestionable command over the situation is a legitimate interest that must be considered when evaluating if detention is justified. *Id*. at 14. In this case, the facts show that defendant was initially detained by the police. He was not arrested until an officer observed cocaine in his coat pocket. Accordingly, the police did not need to justify the initial stop of defendant with probable cause.
>
> Once defendant was detained under *Summers*, the police could properly check defendant for weapons under *Terry v. Ohio*, 392 U.S. 1, 16 [] (1968), for the safety of the officers involved in conducting the raid. Under *Terry*, the police may conduct a "limited patdown search for weapons if the officer has a reasonable suspicion that the individual is armed, and thus poses a danger to the officer or to other persons." *People v. Custer*, 465 Mich. 319, 328 []

(2001). In this case, the police had information that defendant had committed violent crimes in the past with firearms and that he carried a firearm. The police were justified in ordering defendant to exit the vehicle to determine if he possessed a weapon.

Once defendant was ordered out of the vehicle, an officer observed a plastic bag containing an off-white substance that appeared to be cocaine. That substance was properly seized under the plain-view exception. *People v. Champion*, 452 Mich. 92, 101-103 [] (1996). For these reasons, the trial court did not err in denying defendant's motion to suppress.

*Anderson*, 2006 WL 2787878, at *2-3. The Michigan Court of Appeals also found, albeit without much discussion, that "[a]lthough defense counsel did not explore at the evidentiary hearing or trial certain matters that were raised at the preliminary examination, this was a matter of trial strategy and defendant has not overcome the strong presumption that counsel exercised sound strategy." *Id*. at *7. Furthermore, the state court concluded that petitioner "ha[d] not demonstrated that there is a reasonable probability that the result of the proceedings would have been different had the matters in question been raised or explored below." *Id*.

Whether or not this can be said to be a matter of trial strategy, we agree with the state court's assessment that the failure to impeach Officer Siner with his prior testimony that he "yelled" for petitioner to show his hands and "pulled on his arm" to remove him from the vehicle would not have impacted the determination that petitioner was lawfully detained under *Summers*. The testimony at the suppression hearing established that petitioner had been identified as the driver of the Expedition, was seen exiting the residence to be searched as the raid team was en route, was the target of the search, was known to have prior convictions for assault with a firearm, and was believed to be staying at the residence to be

searched. Even if defense counsel had succeeded in getting Officer Siner to repeat his preliminary examination testimony, the difference in the description of the "take down" would not have been sufficient to establish that the initial detention was a full-blown arrest. *See Muehler v. Mena*, 544 U.S. 93, 98-99 (2005) (holding that officers may use reasonable force to effect a *Summers* detention). Moreover, keeping in mind the deference due the state court's determination, we cannot conclude that the state court's decision on this issue was contrary to or an unreasonable application of *Strickland*.

### b.      Error of Fact in Order Denying Motion to Suppress

The trial court's order appears to incorrectly attribute the two controlled purchases of cocaine to petitioner in discussing both whether there was probable cause to support the issuance of the search warrant—a conclusion not contested in the state court or here—and whether the seizure of petitioner was permitted under *Summers*. Petitioner faults defense counsel for failing to "correct" this misstatement of fact. Assuming that this claim, raised as part of the now-abandoned Fourth Amendment claim, is fairly viewed as asserting a claim for ineffective assistance of counsel, we cannot conclude that the failure to file a motion for reconsideration on this basis would warrant habeas relief.

Whether oversight or trial strategy, there is no reasonable probability that but for the failure of counsel to correct the trial court on this point the result would have been different. It is clear that the state court did not rely on the prior drug sales at all in finding that the seizure of cocaine from petitioner was not the result of an illegal search and seizure. Nor does petitioner offer any theory under which the correction of this fact would be

determinative of the Fourth Amendment claim urged in the suppression motion.[7]

### c.        Failure to Present Coherent Argument under *Summers*

Finally, petitioner contends that Attorney Henry failed to present a coherent argument

that petitioner's detention was not authorized under *Summers* because the officers

manipulated the circumstances of the search by waiting for petitioner to return before

executing the search warrant.  Petitioner asserts that but for counsel's error, the cocaine

seized from his person would have been excluded from evidence.  On the contrary, counsel

elicited the critical testimony that petitioner was the target of the search and argued that the

decision to wait to execute the search warrant precluded reliance on *Summers*.

This same argument was squarely raised and explicitly rejected on the merits by the

Michigan Court of Appeals following a de novo review of the suppression motion, reasoning

as follows:

> It is undisputed that the police were executing a search warrant when
> they stopped defendant. In *Michigan v. Summers*, [] the Supreme Court held
> that "a warrant to search for contraband founded on probable cause implicitly
> carries with it the limited authority to detain the occupants of the premises
> while a proper search is conducted" (footnote omitted).  In *United States v.
> Cochran*, [] the Sixth Circuit Court of Appeals found that the detention of a
> defendant was justified under *Summers* where the defendant was stopped after
> driving a short distance from his home. . . .
>
> . . . .
>
> The detention of defendant in this case was similarly justified under

---

[7]The Michigan Court of Appeals rejected the claim that trial counsel failed to properly challenge the search warrant affidavit, stating:  "Defendant concedes, however, that the affidavit was sufficient.  He explains that he raises this argument only to show that counsel did not comprehend all the rules of criminal procedure.  Because defendant concedes that he was not prejudiced by counsel's alleged error, he cannot establish a claim of ineffective assistance of counsel on this basis." *Anderson*, 2006 WL 2787878, at * 7.

*Summers* and *Cochran*. Although the police waited until defendant returned to the residence to execute the search warrant[1] and then stopped him approximately twenty yards from the residence, the circumstances do not suggest that the police manipulated the situation in order to search defendant. During the time defendant was gone, another occupant of the house, Shaniqua Broom[e], frequently came to the doorway and looked outside. It was reasonable for the officers to believe from Broom[e]'s conduct that defendant was expected to return shortly. For the officers' safety, it was not unreasonable for them to wait until defendant returned and then detain him instead of risking beginning the search and having defendant return while many of the officers were inside conducting the search. The facts do not demonstrate a bad-faith effort by the police to manipulate the circumstances surrounding the search of the residence to include defendant, who was a target of the search warrant, although he was identified only by a nickname. Under *Summers* and *Cochran*, the police were justified in detaining defendant and removing him from his vehicle while conducting the search, regardless of whether he had engaged or was about to engage in criminal activity.

> [1]Defendant had been seen by a surveillance officer leaving the residence in a vehicle about one hour before execution of the warrant.

*Anderson*, 2006 WL 2787878, *1-2. Petitioner does not suggest any argument or authority that should have been cited beyond *Summers* and *Cochran*.[8]

Keeping in mind that we may not reexamine the merits of the motion to suppress, we find that defense counsel's failure to persuade the state court that the detention was invalid under *Summers* does not establish either deficient performance or prejudice. *See Burchett v. Kiefer*, 310 F.3d 937, 942-44 (6th Cir. 2002) (discussing authority to detain under *Summers*).

---

[8]The "manipulation" argument comes not from *Summers* but from *Cochran*, where the majority opinion found that the initial detention a short distance from the premises to be searched was proper under *Summers*. It was only in discussing the further search of the vehicle that the court added that "the facts and evidence do not suggest that the police attempted to manipulate the circumstances in order to search *defendant's car*. Indeed, it was defendant's acts, not those of the police, that led to the search of the automobile." *Cochran*, 939 F.2d at 339 (emphasis added).

### 3.    Counsel's Errors at Trial

Petitioner claimed that defense counsel rendered ineffective assistance of counsel at trial by failing to introduce the search warrant into evidence, failing to elicit supposedly "exculpatory" evidence raised at the preliminary examination, eliciting unfavorable testimony from petitioner's mother and Officer Janczarek, and failing to object to the field testing of the cocaine during trial. These arguments were presented and rejected by the Michigan Court of Appeals on the merits.

"There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Harrington*, 131 S. Ct. at 790 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003)). "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 131 S. Ct. at 791. Rather, *Strickland* requires that petitioner show that it is reasonably likely that the result would have been different. *Id*. at 792.

#### a.    Search Warrant

Defense counsel planned to refer to an enlargement of the search warrant during closing argument, but the prosecutor anticipated the attempt and objected before closing arguments because the warrant had not been admitted into evidence. The state court found there was no showing that petitioner was prejudiced by the inability to refer to the warrant in closing. Petitioner now argues that he was prejudiced because counsel "promised" in

opening that the jury would see the warrant and then failed to introduce it, which created a negative inference that could have led the jury to conclude that the warrant named him.

In particular, petitioner relies on our comment that "'little is more damaging than to fail to produce important evidence that had been promised in an opening.'" *English v. Romanowski*, 602 F.3d 714, 729 (6th Cir. 2010) (citation omitted). It is far from clear that the warrant was "important evidence" or that the failure to introduce it into evidence was prejudicial. First, there was no suggestion at trial that the warrant was anything but a warrant to search the premises. Second, the point of the reference in opening statement was to suggest bad faith by the officers who waited for petitioner to return before executing the search warrant. Third, the affidavit accompanying the warrant, which the prosecutor would have insisted also be admitted, named "Smiley" as the target of the drug trafficking investigation. Petitioner has not shown a reasonable probability that the result would have been different if counsel had introduced the warrant. Petitioner cannot establish prejudice under *Strickland*, much less that it was objectively unreasonable for the state court to conclude that no prejudice resulted.

### b.      Failure to Introduce "Exculpatory" Evidence

The state court found that defense counsel's failure to explore matters that were raised at the preliminary examination was a matter of trial strategy, and that petitioner did not overcome the strong presumption that counsel exercised sound strategy. The state court also concluded that petitioner did not demonstrate a reasonable probability that but for the failure to elicit the evidence the result would have been different. At the preliminary examination,

the prosecutor stipulated that, in addition to bags of cocaine, the brown tote bag also contained important papers belonging to Broome, including tax documents, a social security statement, and documents from HUD and H&R Block. There was also a stipulation that the spiral notebook found in the nightstand had writing in it that appeared to be from three different people—possibly, a man, a woman, and a child.

There is no reason to think that defense counsel was unaware of this evidence. Moreover, evidence tying Broome to the tote bag containing the cocaine would not negate the finding of constructive possession by petitioner; particularly as the jury was also instructed on joint possession. As for the spiral notebook, the record does not indicate whether the drug tally sheet within the notebook was written in more than one hand. Evidence that a child or woman had also written in the notebook would not have been "exculpatory." Also, calling attention to differences in handwriting would have placed more focus on evidence that was consistent with ongoing drug trafficking. We find that it was not objectively unreasonable for the state court to conclude that defense counsel's failure to elicit or introduce this evidence was a reasonable strategic decision that did not result in prejudice to petitioner.

### c.    Counsel Elicited "Unfavorable" Testimony

Here, petitioner argues that he received ineffective assistance of counsel as a result of the decision to call his mother, Kathryn Carr, and to question Officer Janczarek about whether "dopesters" wear fancy clothes and shoes. Petitioner now argues that the strategic decisions were not reasonable because they were based on inadequate investigation.

*Strickland* explained that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-91.

First, it is true that Carr's concession on cross-examination that petitioner "dated," "socialized," and sometimes spent the night with Broome was consistent with the prosecution's theory that petitioner had sufficient connection to the Karen Court residence to establish constructive possession of the cocaine and firearm found there. However, it is hard to imagine that counsel had failed to determine the relationship between petitioner and Broome before deciding to call petitioner's mother. Nor can we conclude that it was unreasonable to call Carr to testify that petitioner lived with her. Carr provided the only evidence that petitioner lived with her, that her home was the address where he received mail, and that parole officers had even verified that petitioner was living with her while on parole. Although she conceded that petitioner had been released from parole before the search, her testimony presented the jury with evidence which, if believed, showed that he did not reside at the Karen Court residence.

Second, petitioner complains that in cross-examining Officer Janczarek, defense counsel elicited testimony that caused petitioner's shoes to become evidence against him. Defense counsel asked Officer Janczarek about the "Kmart" jacket that petitioner was wearing when he was detained and whether "dopesters" dress nicely or wear alligator shoes.

When the witness answered that "[t]hey may dress nice, they may not," counsel asked if he had "ever seen a dopester from the beginning of the world up until now that would have in his closet anything but Armani or some very expensive suit?" The following exchange ensued:

Q:     Ever seen any of them didn't have alligator shoes?
A:     Yes.
Q:     Yeah. But what about some of the Italian shoes? . . . they could wear shoes from Kmart?
A:     They could.
Q:     They could, but do they? . . . I'm asking you as an expert.
A:     Have I ever seen a drug dealer wear shoes that I would consider poor, like not nice shoes? Yes, I have.
Q:         What about Nike . . . sports shoes that —
A:     Yes.
Q:     — Nike makes.
A:     Yes. Quite often, in fact —
Q:     Sell for 175 — I beg your pardon?
A:     Yes. Quite often, in fact, the people that are out selling drugs on the street are wearing tennis shoes so when they see me they are able to run from me.

Petitioner's complaint is not that the witness said drug dealers wear all kinds of clothes and shoes, but that this line of questioning opened the door for the prosecutor to point out that petitioner was wearing what appeared to be snake or alligator skin shoes. Petitioner argues that this was not "reasonable trial strategy" because it could not have been based on a reasonable investigation of petitioner's footwear on the day of trial.

The Michigan Court of Appeals concluded this questioning did not result in prejudice because the officer testified as an expert that drug dealers wear all types of clothing and shoes, both expensive and inexpensive. It was not objectively unreasonable for the state court to conclude that there was no reasonable probability that but for the misguided

questioning that invited attention to petitioner's shoes, the result would have been different.

### d.        Field Testing of Cocaine

Acknowledging that this was raised as a claim of prosecutorial misconduct, and abandoning his separate claim based on the admission of this evidence, petitioner contends that we should permit him to argue that trial counsel's failure to object to this evidence denied him effective assistance of counsel. The Michigan Court of Appeals, albeit reviewing for plain error, explained in pertinent part:

> During trial, the prosecutor asked the officer in charge to perform field tests on each of the substances [that had not been tested] in court, using the Cobalt Thiocyanate test. The officer characterized this type of test as a preliminary test and testified that he was trained to perform field tests on suspected narcotics. All samples that were tested in court were positive for the presence of cocaine.
>
> Defendant now argues that the results of the field tests conducted in court were erroneously admitted because the Cobalt Thiocyanate test is only a "presumptive" test and can indicate the presence of other narcotics besides cocaine. He further argues that the jury should have been instructed on the limitations of this type of test.
>
> Defendant relies on *People v. Velasquez*, 125 Mich. App. 1, 4 [] (1983), which refers to the limited nature of the Cobalt Thiocyanate test, and an unpublished Tennessee case, *State v. Roberts*, 2004 WL 2715316 (Tenn Crim App), in support of his arguments. Neither of these decisions addresses the admissibility of Cobalt Thiocyanate test results.
>
> Although the Cobalt Thiocyanate test may not be dispositive of whether a substance is actually cocaine, defendant has not established any basis in the record for concluding that the substances analyzed in this case were inaccurately classified as containing cocaine. Moreover, the officer in charge explained how the test is conducted, performed the testing in court, and characterized the this type of test as preliminary only.

*Anderson*, 2006 WL 2787878, at *5. While this evidence was damaging to the defense, it was relevant and petitioner has not demonstrated that there was a basis to exclude the

evidence under state law. Petitioner has not demonstrated that counsel's performance was deficient or that the failure to object resulted in prejudice under *Strickland*.

It may be that petitioner frames this issue as an ineffective-assistance-of-counsel claim in order to emphasize the comment that Attorney Henry made suggesting his belief that the substance was or would test positive for cocaine. Specifically, as Officer Janczarek began to field test the substances found in the house, defense counsel commented:

> Your Honor, I hope that this cocaine doesn't float around this, this room because I hear about people sniffing cocaine and getting high and I don't feel like getting high off some cocaine. I just – I don't mind him doing this test, but I sure hope he does this over there so that the cocaine or whatever it is stays in there.

First, this claim was not raised in the habeas petition or in the state court. Second, the comment, although suggesting a belief that the substances did contain cocaine, did not result in prejudice since the evidence suggested that it did contain cocaine. There was testimony that it looked like cocaine, smelled like cocaine, and tested positive for cocaine. Moreover, as the state court observed, there is no basis in the record to conclude that the substances were not cocaine.

## C.    Prosecutorial Misconduct

Finally, petitioner seeks habeas relief on the grounds that the prosecutor committed misconduct during closing argument by referring to Broome as petitioner's "pregnant girlfriend" once and as his "girlfriend" three other times. Although the district court found that all of petitioner's prosecutorial misconduct claims were procedurally defaulted (based on the state court's plain error review), the record demonstrates that defense counsel objected

to the first reference to Broome as petitioner's "pregnant girlfriend" and that the objection was sustained. Petitioner emphasizes on appeal that the jury asked during deliberations whether they could find out "who is the father of the baby that the woman was pregnant with (the woman who lived in the apartment)?" The jury was told they could not. No objection was made to the other three "girlfriend" references.

We have adopted a two-step approach for evaluating claims of prosecutorial misconduct. *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002). We first determine whether the prosecutor's conduct and remarks were improper, and, if so, "'whether the impropriety was flagrant' and thus violated the defendant's due process rights." *Id*. (quoting *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)). Petitioner argues that the comments were improper because they argued facts not in evidence. The state court disagreed, however, explaining that although there was no direct testimony that Broome was defendant's "girlfriend," "it was not improper for the prosecutor to argue that the jury could infer from the evidence that defendant was having a relationship with Broom[e] and shared a bedroom with her in the Karen Court residence." *Anderson*, 2006 WL 2787878, at *6. Assuming that this claim was not procedurally defaulted, we agree with the state court that the prosecutor's arguments "constituted proper commentary on the evidence and reasonable inferences arising therefrom." *Id*. Moreover, petitioner has not demonstrated that the state court's decision on this claim was contrary to or an unreasonable application of Supreme Court precedent.

**III.**

Accordingly, the district court's judgment denying the petition for writ of habeas corpus is **AFFIRMED**.

**KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.** I agree with the majority that we must affirm the district court's denial of Anderson's petition for a writ of habeas corpus under the strictures of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). I write separately, however, to explain my view of Anderson's troubling ineffective-assistance-of-counsel claim.

The state-court transcripts reveal that Anderson's counsel had a significant hearing impairment that impacted his ability to follow the pre-trial and trial proceedings. Without being able to follow the testimony and evidence admitted at trial, counsel could not make reasonably informed decisions of trial strategy. Rather, defense counsel's representation was based on his mistaken beliefs about what was happening at trial and therefore deserves no deference. The state court believed that counsel's inability to hear and follow the proceedings was alleviated with the help of the trial judge, prosecution, and witnesses—i.e., the other participants in our adversarial system. Representation under these circumstances "puts at risk both the defendant's right to an ample opportunity to meet the case of the prosecution, and the reliability of the adversarial testing process." *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (citations omitted) (internal quotation marks omitted); *accord Strickland v. Washington*, 466 U.S. 668, 686 (1984).

It is difficult for me to see how a defendant would not be prejudiced by a counsel's inability to hear and follow the trial proceedings to the degree demonstrated by the state-court transcript. Nevertheless, the Supreme Court has significantly limited the circumstances in which the presumption of prejudice from *United States v. Cronic*, 466 U.S. 648, 659 (1984),

applies. *See Bell v. Cone*, 535 U.S. 685, 695–98 (2002). Anderson, therefore, must demonstrate prejudice under *Strickland*. Furthermore, because we are reviewing Anderson's ineffective-assistance claim under AEDPA, Anderson must show that the state court's adjudication of his ineffective-assistance claim "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court] law." 28 U.S.C. § 2254(d). I cannot conclude that Anderson has met this exceedingly difficult burden.

I recognize, too, that Anderson is in an intolerable bind. He presented the very same arguments of ineffective assistance of counsel to the state court in his motion for a *Ginther* hearing, but the state court denied him the opportunity to develop an evidentiary record to support his claim. Then, when denying Anderson's ineffective-assistance claim on the merits, the state court concluded that Anderson had not demonstrated prejudice and presumed that counsel's actions were a matter of trial strategy in the absence of testimony from counsel explaining his reasoning. Anderson's ability to develop an evidentiary record of the prejudice from counsel's hearing impairment is now prevented on account of defense counsel's death in 2006.

With respect to Anderson's claim of prosecutorial misconduct, I disagree with the majority that the prosecutor's comments that Broome was Anderson's pregnant girlfriend constitutes proper commentary on the evidence. As the state trial court stated in answering the jury's question, "[t]here was no evidence as to who the father" of Broome's baby is. R.8-12 at 73 (Trial Tr. at 323). The prosecutor's statements were improper. However, under this Circuit's test for "determining whether the impropriety was flagrant," I cannot conclude that

the improper remarks warrant reversal and granting the writ under AEDPA. *See United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001).